FILED - GR
October 26, 2026 9:20 AM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY:JJM SCANNED BY: JM / 10/26

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

ANA BAIRES, Plaintiff,

v.

TREEHOUSE FOODS, INC. and BAY VALLEY FOODS, LLC, Defendants.

Case No. 1:26-cv-02892-HYJ-PJG

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

Plaintiff Ana Baires, proceeding pro se, alleges as follows:

## I. PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Ana Baires is an employee of Bay Valley Foods, LLC, affiliated with TreeHouse Foods, Inc., at the Wayland, Michigan facility. Plaintiff began employment in approximately July 2025 and alleges that she remained employed during the events described below.

2. Defendants TreeHouse Foods, Inc. and Bay Valley Foods, LLC are alleged to have employed Plaintiff, jointly or as applicable, and to have controlled relevant workplace conditions, supervisory conduct, discipline, and employment opportunities. The precise legal relationship and responsibilities of each Defendant are subject to proof.

3. This action asserts claims under Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act (ADA). This Court has original federal-question jurisdiction under 28 U.S.C. § 1331. Plaintiff invokes supplemental jurisdiction under 28 U.S.C. § 1367 for related Michigan-law claims, including the Michigan Elliott-Larsen Civil Rights Act (ELCRA), MCL 37.2101 et seq., and the Michigan Whistleblowers' Protection Act (WPA), MCL 15.361 et seq. Plaintiff also identifies a potential issue under the Bullard-Plawecki Employee Right to Know Act, MCL 423.501 et seq., including MCL 423.506, arising from alleged disclosure of her disciplinary information to police; whether that disclosure supports an additional claim is subject to the statute's requirements and exceptions.

4. Venue is proper in the Western District of Michigan because the events alleged occurred at Defendants' Wayland, Michigan facility. Plaintiff alleges that she received an EEOC Notice of Right to Sue dated July 14, 2026 and filed her original federal action October 8, 2026. The scope and exhaustion of particular claims remain subject to the administrative record and applicable law.

## II. FACTUAL ALLEGATIONS

### Employment Background — July 2025

5. Plaintiff began working at Bay Valley Foods, LLC, a subsidiary of TreeHouse Foods, Inc., at its Wayland, Michigan facility in approximately July 2025.

6. During her employment, Plaintiff experienced conduct she alleges constituted discrimination and harassment based on her sex, Salvadoran national origin, Latina ethnicity, religious beliefs, including her atheism, and sexual orientation. Plaintiff also experienced harassment concerning her short stature.

7. Plaintiff repeatedly raised concerns about workplace harassment, discrimination, unequal treatment, and unsafe working conditions. She alleges that Defendants failed to adequately address several of those

concerns and that she subsequently experienced disciplinary action, increased scrutiny, lost employment opportunities, and other adverse treatment.

**July 2025–February 2026 — Beginning of Employment, Initial Workplace Safety Concerns and Verbal Complaints, Religious Harassment, and Discriminatory Remarks About Latino Employees**

8. From the beginning of her employment and initial training in the Hot Mix area in July 2025, Plaintiff verbally raised concerns about unsafe working conditions and procedures, including the handling of heavy chemicals and heavy rework bags. Plaintiff repeatedly brought these concerns to production supervisors Eric London and Cody South, as well as Safety Manager Ron DePetro, requesting that the safety hazards and work procedures be addressed.

9. Beginning in approximately July 2025 and continuing through February 2026, coworker Arianna Rivas repeatedly initiated conversations with Plaintiff concerning Christianity and attempted to persuade Plaintiff to adopt her religious beliefs. Although Rivas worked third shift, she frequently arrived early, at approximately 8:00 p.m., to provide Plaintiff with workplace training in the Hot Mix area. During these training sessions, Rivas regularly initiated religious conversations in Spanish, asking questions such as, "¿Tú vas a alguna iglesia?" ("Do you attend any church?") and stating, "Yo soy cristiana. Deberías de venir a la iglesia conmigo" ("I am Christian. You should come to church with me"). Plaintiff initially responded politely to avoid offending Rivas, declining invitations with statements such as, "No, thanks, I'm good," or "Maybe I'll think about it." Despite Plaintiff's lack of interest, Rivas continued initiating religious discussions, which occurred almost daily and frequently dominated their conversations.

10. Rivas repeatedly discussed Jesus Christ, the Bible, and Christianity and invited Plaintiff to women's church services, Sunday family services, and holiday gatherings. These invitations continued over several months rather than occurring as isolated events.

11. As Rivas's religious invitations and discussions continued, Plaintiff repeatedly and respectfully explained her religious beliefs and asked Rivas to respect them. On multiple occasions, Plaintiff told Rivas words to the effect of: "Arianna, I appreciate your invitation to church, but I am an atheist. I was a Christian for a very long time, and my whole family is Christian. Even my family respects my religious beliefs because they know I would never return to Christianity. I respect people like you who go to church, but I want you to respect my beliefs as well." Despite these repeated explanations and requests, Rivas continued attempting to persuade Plaintiff to attend church and embrace Christianity.

12. Despite Plaintiff's repeated objections and requests that her religious beliefs be respected, Rivas continued insisting that Plaintiff needed Jesus and should attend church. Rivas also repeatedly contacted Plaintiff outside of work through telephone calls and text messages, including sending invitations to attend church and participate in religious activities.

13. On multiple occasions, Rivas attempted to pray over Plaintiff while placing her hands on Plaintiff's shoulders or back. On one occasion, Rivas grabbed Plaintiff by both shoulders, shook her, and insisted that Plaintiff needed to attend church and accept Jesus.

14. Plaintiff also became aware of Rivas attempting to persuade coworkers Josh Hoyle, Rolando Reid, and Dylan VanVolkinburg to adopt her religious beliefs. Plaintiff believed the pressure directed toward her was particularly frequent because she and Rivas could communicate extensively in Spanish.

15. Beginning in approximately July 2025, Rivas repeatedly made derogatory statements about Latino employees and individuals of Latin American origin. Rivas knew Plaintiff was Latina and of Salvadoran national origin.

16. While Arianna Rivas was training Plaintiff in the Hot Mix area, Rivas made derogatory remarks in Spanish about Latino employees at her former workplace, Tyson Foods. Rivas stated words to the effect of: “Yo trabajaba en Tyson Foods. Ese lugar a mí no me gustaba porque mucho latino ilegal ahí, que los supervisores le daban más preferencia a ellos que a uno que es ciudadano.” In English, this means: “I used to work at Tyson Foods. I did not like that place because there were many undocumented Latinos there, and the supervisors gave them preferential treatment over people like me who are citizens.”

17. On multiple occasions, Arianna Rivas made derogatory remarks concerning Latino immigrants and expressed approval of immigration policies intended to remove undocumented immigrants from the United States. Plaintiff specifically recalls one such incident occurring near the pit in the Hot Mix area, where Rivas made a statement to the effect of, "It’s good that we have this president because he’s going to get rid of all illegal immigrants."

18. On a separate occasion, while Rivas was walking through the hallway toward Dryer 2, Plaintiff overheard Rivas making a derogatory statement about Latino employees to another coworker. Speaking in English, Rivas stated words to the effect of, "Every job I’ve had, I don’t have problems working with anybody but Latinos." Although Plaintiff does not recall the identity of the coworker to whom Rivas directed the remark, Plaintiff personally heard Rivas make the statement.

19. On multiple occasions, at approximately midnight, when Plaintiff’s shift was ending and Arianna Rivas was supposed to take over Plaintiff’s duties in the Hot Mix area, Rivas behaved aggressively toward Plaintiff during shift handoffs. Rather than simply accepting the handoff, Rivas would snap her fingers at Plaintiff, raise her voice, and issue commands requiring Plaintiff to perform additional tasks at the end of her shift. On one occasion, Rivas snapped her fingers at Plaintiff and ordered her to retrieve a cleaning device known as “the Pig,” stating, “Go get it.” Plaintiff perceived Rivas’s repeated finger-snapping and commanding behavior as hostile, intimidating, and disrespectful.

20. On other occasions, during these approximately midnight shift handoffs, Rivas aggressively demanded that Plaintiff dispose of trash left behind by employees from an earlier shift. When Plaintiff attempted to explain that the trash was already present when she began her shift, Rivas continued snapping her fingers, raising her voice, and ordering Plaintiff in Spanish, “Ve, ve, tíralo, ve, tíralo” (“Go, go, throw it away, go, throw it away”). These incidents occurred as Rivas was supposed to be assuming responsibility for the Hot Mix area from Plaintiff, and Plaintiff experienced the repeated shouting, finger-snapping, and demands as humiliating and hostile.

**September–November 2025 — Hostile Conduct During Training and Derogatory Remarks Concerning LGBTQ+ Employees**

21. During Plaintiff’s training in the Hot Mix area, Plaintiff witnessed Arianna Rivas speaking with another person by telephone while seated in the employee break room. Speaking in Spanish, Rivas stated words to the effect of, “Yo la tengo a la muchacha haciendo todo ahí, y mírame a mí” (“I have the girl doing everything over there, and look at me”). As she spoke, Rivas gestured toward herself and sat with her feet resting on another chair. Plaintiff understood the statement and gestures as Rivas boasting that Plaintiff was doing the work while Rivas relaxed in the break room.

22. On a separate occasion during Plaintiff’s training, Plaintiff and Rivas were conversing in the women’s locker room when Rivas made derogatory remarks concerning LGBTQ+ symbols. Speaking in Spanish and pointing toward rainbow stickers displayed on lockers in the room, Rivas stated words to the effect of, “Mira, yo tolero cualquier cosa, pero esa cosa,” and continued, “Eso yo no lo tolero. Esa cosa yo la odio” (“Look, I tolerate anything, but that thing. I do not tolerate that. I hate that thing”). Plaintiff personally heard Rivas make these remarks and saw her point toward the stickers.

**September 2025 — Training Refusals, National-Origin Concerns, and Unsafe Confined-Space Entry**

23. In approximately September 2025, on at least two occasions during a weekend, Plaintiff reported for her scheduled training in the Hot Mix area and was told by her assigned trainer, Ariana Roberts, a white female coworker, that Supervisor Eric London had directed Plaintiff to perform housekeeping duties in the dryer area instead. Plaintiff questioned these instructions and asked London whether he had issued them. London denied doing so and confirmed that Plaintiff was supposed to be training in the Hot Mix area.

24. During this period, Roberts also repeatedly asked Plaintiff whether she was Latina and whether she spoke Spanish. The repeated discrepancies between Roberts's statements and London's instructions, together with Roberts's questions about Plaintiff's ethnicity and language, caused Plaintiff to suspect that Roberts was interfering with her training because of her Latina ethnicity.

25. During this period, Roberts took Plaintiff into a fifth-floor confined space without Plaintiff having received the required training, appropriate protective equipment, or necessary entry paperwork. While inside, Roberts warned Plaintiff, "Don't get too far over there because you can fall and die."

26. In approximately September 2025, Plaintiff personally approached Human Resources and Training Coordinator Melissa Smithers at her desk in the plant's front office to verbally report concerns regarding trainer Ariana Roberts's conduct. Plaintiff explained that Roberts had repeatedly interfered with her scheduled workplace training and that Roberts's behavior toward Plaintiff had become increasingly hostile. Despite Plaintiff's verbal complaint to Smithers, Roberts's conduct allegedly continued.

**September–October 2025 — Sexual Harassment, Unwelcome Physical Contact, and Height-Based Harassment**

27. Beginning in approximately September 2025, coworker Victoria Hotchkiss repeatedly initiated unsolicited, sexually explicit conversations in Plaintiff's presence. These conversations frequently occurred in the employee locker room, sometimes in front of other coworkers, including former coworker Megan Nash. Hotchkiss regularly discussed intimate details of her sexual relationship with her husband, including statements such as, "Oh my God, I was so horny last night and my husband wouldn't fuck me," explaining that her husband was demisexual and had a lower sex drive.

28. On multiple occasions, Hotchkiss discussed watching pornography and using sex toys to satisfy herself because her husband would not have sex with her. She also stated words to the effect of, "My husband only lets me use toys that are smaller than him, not bigger than him," referring to the size of her husband's penis. These repeated, sexually explicit discussions made Plaintiff extremely uncomfortable.

29. As these conversations continued, Hotchkiss began directing intrusive sexual questions toward Plaintiff. On at least one occasion, she asked Plaintiff whether she watched pornography or used sex toys. Plaintiff found these questions unwelcome, invasive, and inappropriate in the workplace. The repeated sexual discussions and questioning caused Plaintiff significant discomfort, particularly because they occurred in a professional environment and sometimes in the presence of other employees.

30. Plaintiff repeatedly asked Hotchkiss to stop questioning her about sexual matters. Despite those objections, Hotchkiss continued the conduct over several months.

31. On October 5, 2025, Hotchkiss pressured Plaintiff to complete an online questionnaire concerning sadomasochism. Because English is not Plaintiff's first language, Plaintiff did not immediately understand the questionnaire's sexual nature. Plaintiff felt uncomfortable after understanding its purpose.

32. Beginning in approximately October 2025 and continuing through late March 2026, coworker Patrick Mitchell repeatedly subjected Plaintiff to unwanted physical contact, including hugging Plaintiff and pressing her body tightly against his. Initially, Plaintiff briefly and politely reciprocated some of these hugs to avoid appearing rude or offending Mitchell.

33. As Mitchell's hugs became increasingly frequent, excessive, and sexually inappropriate, Plaintiff noticed that Mitchell repeatedly directed his gaze downward toward her breasts during these encounters. Plaintiff became increasingly uncomfortable and stopped reciprocating his hugs. Instead, Plaintiff would remain physically still and freeze during the unwanted contact, uncertain how to react or remove herself from the situation. Plaintiff's lack of physical resistance did not indicate that the contact was welcome; rather, she felt uncomfortable and did not know how to respond to Mitchell's behavior.

34. During this period, Plaintiff heard coworkers warn employees that Mitchell allegedly had influence with management and could cause employees to lose their jobs. These statements contributed to Plaintiff's concern about objecting to his conduct.

35. Beginning in approximately September or October 2025, coworker Patrick Mitchell repeatedly approached management and supervisors and requested that Plaintiff be removed from the Hot Mix department because of her short stature. Plaintiff alleges that Mitchell's efforts to have her removed contributed to height-based harassment and unequal treatment in the workplace.

**December 2025 — Sexual Harassment and Sexually Inappropriate Workplace Conduct**

36. In approximately December 2025, Plaintiff learned from trainer Ariana Roberts that male coworkers had discussed Plaintiff's body, including speculation about whether her physical features were natural or artificially enhanced. On December 20, coworkers Rolando Reid and Roberts also informed Plaintiff that Tia Cornell had made derogatory remarks about Plaintiff's body, including describing it as "weird" and "fake."

37. Plaintiff previously worked with Tia Cornell at Coca-Cola. During that employment, Plaintiff personally observed Cornell make comments in the presence of other employees when Plaintiff entered the locker room or break room. On multiple occasions, Cornell stated words to the effect of, "Yeah, when I get my tax return, I'm gonna get my body done," while looking toward Plaintiff. Plaintiff perceived these remarks and accompanying looks as directed at her body. Plaintiff also witnessed Cornell engage in sexually explicit conversations at Coca-Cola. Later, while employed at TreeHouse Foods, Plaintiff learned from trainer Ariana Roberts that Cornell had made remarks about Plaintiff's body to male employees in the Dryer area. Roberts reported that Cornell said words to the effect of, "Do you think her body is real? Ha ha ha. Her body is fake. Her body is not real." Plaintiff did not personally hear that TreeHouse statement and attributes it to Roberts's report. Plaintiff perceived the reported remarks as consistent with Cornell's prior conduct toward her at Coca-Cola.

38. In approximately December 2025, while Plaintiff was performing animal-feed duties alongside coworkers Victoria Hotchkiss and Deonte Harris, Hotchkiss initiated an unsolicited, sexually explicit conversation about her marital sexual experiences. Hotchkiss stated, "I'm not fully satisfied until my husband gives me a cream pie." Because English is not Plaintiff's first language, Plaintiff initially did not understand the sexual meaning of the expression. Hotchkiss then directly asked Plaintiff, in Harris's presence, "How about you, Ana? Do you like cream pies?" Confused by the question, Plaintiff responded, "What is that?" Hotchkiss explained, "It's when a man finishes inside of you," and reiterated that she was not fully satisfied unless her husband engaged in that sexual act. Plaintiff responded, "I don't know. I don't like talking about that," expressing her discomfort with the sexually explicit questioning. Plaintiff found the conversation unwelcome and inappropriate in the workplace.

39. From approximately December 2025 through late May or early June 2026, Plaintiff repeatedly witnessed coworker Justin Daley discussing his sexual experiences, including orgies, swinging, and sexual encounters with women he met at bars. Plaintiff observed some of these conversations occurring in the presence of supervisors Justin Anton and Ereck Thames without intervention in her presence.

**January–February 2026 — Witnessed Sexual Harassment, Sexually Hostile Working Conditions, and National-Origin Harassment**

40. In approximately January 2026, Plaintiff witnessed an interaction between coworker Patrick Mitchell and Ariana Roberts during which Roberts's bra was visibly exposed while the two stood close together, laughed, and engaged in conduct Plaintiff perceived as flirtatious and inappropriate for the workplace. Immediately following the interaction, Roberts approached Plaintiff and, while laughing, stated words to the effect of, "Oh my God, why didn't you tell me that I was showing my bra?"

41. In January 2026, Plaintiff continued experiencing hostile treatment from coworker Ariana Roberts despite having previously verbally reported Roberts's conduct to Training Coordinator Melissa Smithers for management's attention. As described above, Roberts had interfered with Plaintiff's training and questioned Plaintiff about her Latina ethnicity and whether she spoke Spanish. Roberts repeatedly left substantial housekeeping duties for Plaintiff to complete, including large amounts of trash, cardboard, and other cleanup work. Coworker Rolando Reid informed Plaintiff that, while working with Roberts in Hot Mix, he attempted to remove trash and cardboard, but Roberts stopped him and stated words to the effect of, "No, don't do it. Leave it for her. She's gonna do it."

42. Roberts also repeatedly left production blends containing errors from her shift, requiring Plaintiff to address the resulting problems during the following shift and creating additional work beyond the housekeeping duties. Plaintiff personally witnessed Roberts smoking what Plaintiff believed to be marijuana on the production floor and believed that this conduct contributed to Roberts's production mistakes. Plaintiff perceived the repeated additional work as interfering with her ability to perform her regular job duties.

43. After Plaintiff directly asked Roberts to stop leaving her housekeeping duties for Plaintiff, Roberts responded with hostile text messages, including statements to the effect of, "It's your fucking job to do it. If you don't like it, then quit." Plaintiff submitted a formal written complaint concerning Roberts's verbal harassment and hostile conduct to Tina Garvin, who forwarded the complaint to Human Resources Manager Marcy Klavins. Plaintiff subsequently spoke with Klavins and verbally explained that Roberts's continued hostility was interfering with Plaintiff's ability to perform her job duties and that Plaintiff believed Roberts was attempting to push her out of the company.

44. During approximately January and February 2026, Plaintiff witnessed coworker Victoria Hotchkiss directing sexually inappropriate conversations and questions toward former coworker Megan Nash, similar to the conduct Plaintiff had personally experienced. Nash also informed Plaintiff that Hotchkiss repeatedly questioned her about intimate details of the sexual exploitation and abuse she had experienced in a previous relationship with an abusive former partner. Plaintiff understood these disclosures as further evidence that Hotchkiss's sexually intrusive conduct was not limited to Plaintiff but extended to other female employees.

45. Nash informed Plaintiff that coworker Dillon Sweeney had told her, "I want to be the first one to fill you up." Nash also showed Plaintiff text messages she identified as having been sent by coworker Brian Dillenback expressing interest in dating her.

46. Toward the end of February 2026, Nash informed Plaintiff that she had verbally reported sexual harassment to Human Resources. Approximately two weeks after Nash disclosed that complaint, her

employment ended. Given Plaintiff's observations of how Defendants had handled other employees' sexual harassment concerns, the timing of Nash's termination caused Plaintiff significant concern about how the company treated employees who reported such conduct. As a result, Plaintiff lost trust in Human Resources and became increasingly fearful that reporting sexual harassment could expose her to similar adverse treatment.

47. In approximately January 2026, while Plaintiff was speaking Spanish with her mother on the telephone in the employee break room, Patrick Mitchell approached and yelled, "We speak English here, not Spanish."

48. Plaintiff responded, "This is a free country, and I get to speak whatever language I want." Mitchell laughed. Plaintiff perceived his demand as hostile toward her language and Salvadoran national origin.

49. In February 2026, Plaintiff became aware of a social media post attributed to former TreeHouse Foods employee Lizz Ann Fewell, in which Fewell alleged that coworker Tia Cornell offered sexual services to male employees on the production floor at TreeHouse Foods. Plaintiff retained a screenshot of the post. Plaintiff did not personally witness the conduct alleged by Fewell and does not present those allegations as established facts.

50. Plaintiff recalled that, while previously employed at Coca-Cola, she personally overheard Cornell laughing and discussing with other coworkers on the production floor an alleged sexual encounter involving Coca-Cola employees at a private house party. Cornell described an alleged group sexual encounter in which another coworker performed oral sex on her in the presence of others. Plaintiff did not witness the alleged sexual activity but personally heard Cornell discussing it at work. The earlier sexually explicit workplace conversation came to Plaintiff’s mind upon learning of Fewell’s allegations in February 2026.

**February 2026 — Witnessed Hostility Toward a Coworker and Confrontation With Plaintiff**

51. In approximately February 2026, Plaintiff repeatedly observed coworker Arianna Rivas treating coworker Josh Hoyle in a manner Plaintiff perceived as hostile. On multiple occasions, Rivas ignored Hoyle’s shift handoff communications or work-related information or yelled at him. Rivas also repeatedly arrived late to relieve Hoyle at the scheduled midnight shift change. Plaintiff witnessed Hoyle become increasingly frustrated. Hoyle told Plaintiff that he needed to take his son to school the following morning and that Rivas knew this but continued arriving late. After seeing Hoyle’s frustration, Plaintiff offered to speak with Rivas. Plaintiff approached Rivas respectfully in the employee locker room and spoke to her in Spanish, informing her that Hoyle was waiting to be relieved. Rivas immediately raised her voice, made a dismissive hand gesture, and told Plaintiff not to tell her what to do, stating in substance that she could do whatever she wanted. The exchange escalated into an argument, and Plaintiff became angry and responded in Spanish that she was completely fed up with Rivas’s hostile behavior toward Plaintiff and other coworkers, as well as the harassment and hostility Plaintiff had been experiencing from multiple employees. Plaintiff does not know whether this confrontation was motivated by religion or another protected characteristic.

52. The following day, Plaintiff verbally complained to Supervisor Sabrina Gallo, a member of management, about Rivas’s conduct. Plaintiff informed Gallo that Rivas had been engaging in hostile behavior toward Plaintiff and other coworkers, including the confrontation described above.

**Approximately February 2026 — Request for Lifting Assistance and Dismissive Management Response**

53. In approximately February 2026, Plaintiff requested assistance from Production Manager Mike Schwartz with lifting 50-pound bags in Hot Mix without appropriate ergonomic lifting equipment. In the presence of approximately five employees, including Ruth Page, Supervisor Sabrina Gallo, and Megan Nash, Schwartz repeatedly told Plaintiff, "Show me how you do your lifting." Plaintiff perceived his tone and repeated request as sarcastic, dismissive, and humiliating, particularly because he made the remarks in front of coworkers while she was raising a genuine workplace safety concern. Supervisor Gallo then stated, "I sent you some help." Although lifting assistance was subsequently provided, Plaintiff felt that Schwartz had publicly belittled and dismissed her safety concerns rather than addressing them seriously.

**March 2026 — Continued Sexual Harassment**

54. On March 4, 2026, Mitchell approached Plaintiff while she was reviewing the work schedule, displayed her Facebook profile on his phone, and asked whether it belonged to her. After Plaintiff confirmed that it did, Mitchell stated, in substance, "Oh, she got big boobs, it must be her." Plaintiff visibly expressed discomfort and told Mitchell, "Please don't say that," making clear that his sexual remark was unwelcome.

55. Plaintiff understood the remark in the context of Mitchell's previous unwanted physical contact and repeated attention to her breasts.

56. On April 18, 2026, Plaintiff sent Mitchell multiple text messages requesting work-related assistance after encountering a problem moving material through the production line. Plaintiff explained that the equipment was not moving the material and described a possible issue with material coming from the valve. Mitchell did not respond to those requests. Plaintiff viewed his failure to respond, following her express objection to his unwanted sexual remark on March 4, as a continuation of his hostile treatment and possible retaliation.

57. In March 2026, Plaintiff overheard Hotchkiss and Cornell discussing OnlyFans in the women's locker room. On March 17, while Plaintiff sat beside Cornell and Mitchell in the break room, Mitchell stated, "It looks like cum," and Cornell responded, "I will swallow it." Plaintiff considered the exchange sexually inappropriate.

**March–April 2026 — Witnessed Age-Related Derogatory Remarks**

58. During approximately March and April 2026, Plaintiff witnessed coworker Victoria Hotchkiss make derogatory jokes and comments toward coworkers Mary Ellen and Ken Kensington concerning their age, including jokes suggesting that they had Alzheimer's disease. Plaintiff considered the remarks demeaning and age-related harassment.

**Approximately April 2026 — Repeated Lifting and Ergonomic Safety Concerns and Perceived Dismissive Management Response**

59. In approximately April 2026, Plaintiff again raised concerns about repetitive lifting and potential ergonomic hazards associated with handling 50-pound bags on the Bag Line and in Hot Mix. Plaintiff informed Production Manager Mike Schwartz that she was experiencing significant back pain following the repetitive lifting. Schwartz called Safety Manager Ron DePetro and placed the call on speakerphone. During the call, DePetro stated, "Okay, so what does she want?" Schwartz responded, "Just letting you know, you're on speaker right now." Schwartz later informed Plaintiff that DePetro would speak with her the following Monday. Plaintiff perceived DePetro's response as dismissive of her reported pain and safety concerns.

**April 2026 — Appearance-Based Comments, Ethnic Stereotyping, Hostile Coworker Conduct, and Growing Concerns of Discrimination Based on Latina Ethnicity**

60. During April 2026, coworker Crystal Ringleka repeatedly made unsolicited comments about Plaintiff's body and physical appearance, including "You have a very nice body," "I can tell you go to the gym," and "I wish I could go to the gym like you do." Plaintiff found the repeated attention uncomfortable and began limiting her interactions with Ringleka.

61. During April and May 2026, laboratory technician Ken Kensington repeatedly made remarks stereotyping Latina women as "feisty" and referred to Plaintiff as a "hot tamale." Plaintiff considered these comments offensive and based on stereotypes about Latina women.

62. On April 12, 2026, after work, coworker Anthony Williams drove dangerously around Plaintiff's vehicle on the highway, repeatedly swerving, accelerating, and slowing down in a manner that caused Plaintiff to fear a collision. On April 13, 2026, Plaintiff confronted Williams at work and told him that his reckless driving could have killed them both. Williams responded by laughing. Although Plaintiff did not know Williams's motivation, the incident heightened her concerns about the increasingly hostile treatment she was experiencing from coworkers.

63. By approximately April 2026, after experiencing repeated incidents of hostility, harassment, and unequal treatment beginning in July 2025, Plaintiff became increasingly concerned that she was being treated differently from other employees because of her Latina ethnicity and Salvadoran national origin. At the Wayland facility, which employed approximately 100 workers, Plaintiff was one of only two Latina employees, to her knowledge, while the workforce was predominantly White and African American. Given her experiences with derogatory remarks about Latino employees, interference with her training, hostile interactions, and other incidents described in this Complaint, Plaintiff began questioning whether her ethnicity and national origin were contributing factors in the treatment she was receiving. These concerns developed from the cumulative pattern of conduct Plaintiff experienced rather than from any single incident alone.

**Late April–May 2026 — Witnessed Hostility Toward Coworkers, Continued Intrusive and Hostile Conduct Toward Plaintiff, and Unwanted Religious Pressure**

64. During April and May 2026, Ringleka also made statements expressing hostility toward other coworkers. On April 27, she advised Plaintiff not to trust Victoria Hotchkiss. On May 24, she told Plaintiff that she and Justin Daley got along because "we hate the same people." During a weekend in mid-to-late May, Ringleka told Plaintiff that she maintained a friendship with Hotchkiss because she wanted Hotchkiss to leave the company and was encouraging her to find another job.

65. Plaintiff considered these statements concerning and increasingly limited her interactions with Ringleka to work-related matters.

66. On April 26, 2026, Ringleka told Plaintiff in the locker room, "Oh my God, you're so pretty, I hate it." On May 3, Ringleka approached Plaintiff while Plaintiff was crying, learned that Plaintiff was experiencing depression, and began asking questions about Plaintiff's romantic relationship. Plaintiff also learned that Ringleka had sought information about her from coworker Mary Ellen.

67. In approximately May 2026, Rivas wrote Bible verses in Plaintiff's work area despite Plaintiff's earlier objections to unwanted religious pressure.

**May 2026 — Sexual Harassment, Work-Related Boundaries, Continuing Safety Hazards, and Safety Reporting**

68. On May 10, 2026, Hotchkiss asked Plaintiff in the women's locker room whether she was going home to have sex with her boyfriend. Plaintiff felt uncomfortable, lowered her head, and responded, "I don't know." Crystal Ringleka then joined the conversation, stating, "That's my favorite thing to do." Ringleka and Hotchkiss continued discussing their sexual experiences, including comments about their husbands having low sex drives. Plaintiff did not participate in the discussion, remained quiet, and continued changing her clothes and preparing to leave work.

69. On May 10, 2026, while handling an ingredient in Hot Mix using a longstanding pouring practice, Plaintiff experienced an acid splash to her face. Plaintiff believed the pouring method created a splash-back hazard and that face shields were not sufficiently available. Plaintiff documented the incident in a written incident report, raising concerns about the unsafe pouring method and inadequate access to protective equipment.

70. On May 17, 2026, Plaintiff had established firmer boundaries with coworker Victoria Hotchkiss. Plaintiff informed Hotchkiss by text message that she preferred to keep their communications and interactions strictly work-related. Following this communication, Hotchkiss's intrusive sexual questions directed specifically toward Plaintiff ceased.

**May 12–17, 2026 — Workplace Safety and Potential Sex-Based Discrimination Concerns Reported to Management and Management's Response**

71. On May 12, 2026, coworker Crystal Ringleka informed Plaintiff that Supervisor Nicholson had questioned why the bag line was being stopped during employee breaks. Plaintiff explained that stopping the line was the established procedure when adequate relief coverage was unavailable.

72. On May 16, 2026, Plaintiff was assigned physically demanding duties in Hot Mix, including repetitive lifting of more than 100 bags weighing approximately 55 pounds each within less than three hours. Approximately six male employees were working in the Dryer area, some of whom were taking extended breaks. Due to the excessive lifting requirements and concerns about potential ergonomic hazards, Plaintiff approached Supervisor Christopher James Nicholson and requested assistance. Nicholson initially told Plaintiff that he would send someone to help. However, no assistance arrived, and Plaintiff continued performing the physically demanding lifting duties alone for approximately two hours.

73. While Plaintiff continued lifting without assistance, she observed coworkers Jerry Neal and Anthony Williams taking extended breaks. Neal and Williams mocked Plaintiff's difficulty handling the workload, making comments to the effect of, "You can lift those bags. You're strong. You go to the gym," while laughing. Plaintiff felt humiliated and frustrated by their conduct, particularly because she was struggling with the physically demanding workload while male coworkers were taking extended breaks without assisting her.

74. After approximately two hours without receiving the promised assistance, Plaintiff approached Nicholson a second time and asked, "Are you even going to send somebody here? Because you have six men doing absolutely nothing and taking extended breaks." Nicholson responded dismissively, "Isn't that part of your job?" He further stated, "I've never heard anybody complain about the lifting in Hot Mix." Plaintiff perceived these remarks as dismissive and inappropriate because she was raising legitimate concerns about excessive lifting requirements, physical exhaustion, and potential ergonomic hazards. Only after Plaintiff's second request did Nicholson offer to personally assist her. By that point, Plaintiff had already performed a substantial amount of lifting without assistance and was mentally and physically

exhausted from the workload, her coworkers' mocking behavior, and Nicholson's response to her concerns.

75. Plaintiff believed she was subjected to unequal treatment based on sex because she was required to continue physically demanding work without assistance while male employees were available and some were permitted extended breaks.

76. At that point on May 16, 2026, Plaintiff decided to leave work before the end of her scheduled shift because she did not feel safe continuing to work under the existing conditions. Plaintiff had already performed extensive lifting without timely assistance, had been mocked by coworkers while struggling with the workload, and believed her safety concerns had been dismissed by her supervisor. These circumstances left Plaintiff feeling physically and mentally exhausted and unsafe remaining at work that day.

77. On May 16, 2026, Plaintiff went to Supervisor Chris Nicholson's office for a third time to address her ongoing concerns about unsafe and excessive lifting requirements and ergonomic hazards on the bag line, as well as potentially unequal treatment compared with male coworkers who took extended breaks, mocked her difficulty handling the workload, and failed to provide assistance. Plaintiff told Nicholson that she did not appreciate his previous responses to her safety concerns, including his remarks, "Isn't that part of your job?" and "I've never heard anybody complain about the lifting in Hot Mix." Plaintiff reiterated that she was seriously concerned about the unsafe working conditions and the physical demands being placed on her. Rather than addressing those concerns, Nicholson shifted the discussion toward his own performance as a supervisor, stating words to the effect of, "I've never heard anybody complain about me. So far, everybody likes me as a supervisor." Plaintiff responded, "Well, that's not what I've heard." Following Plaintiff's response, Nicholson became defensive and redirected the conversation toward criticizing Plaintiff's performance on the bag line. Nicholson stated that other bag-line employees had complained that Plaintiff was deliberately stopping production to take breaks. Plaintiff disputed that accusation. Nicholson then stated that he was going to stop the conversation because he believed Plaintiff was only trying to argue with him and warned that he would send a note about the interaction to Human Resources. Plaintiff informed Nicholson that she did not feel safe continuing to work under the existing conditions, particularly after her safety concerns had been dismissed, and that she was going home.

78. On May 16, 2026, Plaintiff notified Production Manager Mike Schwartz by text message of her concerns regarding excessive lifting requirements, inadequate assistance, and unsafe working conditions in Hot Mix. During the same text-message conversation, Plaintiff also raised concerns about unequal and disparate treatment based on her sex, including the fact that male coworkers were permitted to take extended breaks while Plaintiff was expected to perform physically demanding lifting duties without adequate assistance. Plaintiff expressly informed Schwartz of her intention to file a complaint with OSHA regarding the unsafe lifting conditions. Through this communication, Plaintiff placed management on notice of both her workplace safety concerns and her belief that she was experiencing unequal treatment based on sex, before the subsequent alleged adverse treatment.

79. On May 17, 2026, Plaintiff submitted a formal written report to Production Manager Schwartz, union stewards, and the Safety Manager concerning unsafe working conditions and potential sex-based discrimination. Through this written report, Plaintiff formally notified management and union representatives of her workplace safety concerns and her belief that she was experiencing unequal treatment based on sex.

80. Plaintiff alleges that Nicholson subjected her to increased monitoring and micromanagement after she escalated her workplace safety complaints and concerns about potential sex-based discrimination to Production Manager Schwartz.

81. In approximately May 2026, Plaintiff encountered publicly accessible social-media content she attributed to Supervisor Christopher James Nicholson. A TikTok post under the username "ChristopherJN" referred to a female member of Congress and displayed a screenshot of a March 13 comment stating, "shoe fits. deport that cheap counterfeit bitch." The screenshot indicated that TikTok had found the comment to violate its Community Guidelines and had received an appeal. Plaintiff also encountered public Facebook content she attributed to Nicholson, including a video expressing support for mass deportations and U.S. Immigration and Customs Enforcement (ICE).

82. Plaintiff found the deportation-related language directed toward a female member of Congress concerning in light of her identity as a Latina woman of Salvadoran origin and the effects of immigration enforcement and mass-deportation policies on Latino and immigrant communities. Her concern was not based on Nicholson's political views or social-media activity alone, but on how she perceived those statements in the context of her interactions with him at work.

83. Specifically, Plaintiff considered the social-media content alongside Nicholson's dismissive responses to her repeated workplace safety and lifting-assistance concerns, his failure to provide timely assistance, and the unequal treatment Plaintiff believed she experienced compared with male coworkers, as described above. Taken together, these circumstances caused Plaintiff to question whether bias related to her sex, Latina ethnicity, or Salvadoran national origin might be contributing to Nicholson's treatment of her.

**May 2026 — Coworker Hostility and Alleged Intimidation Following Internal Safety and Sex-Discrimination Complaints**

84. After Plaintiff reported workplace safety concerns and potential sex-based discrimination to management, she experienced what she perceived as increasing hostility from coworkers, including Jerry Neal. Neal repeatedly made comments to Plaintiff such as, "Nobody tells me how to live my life," and, "I can take an hour break if I want to, and you still get paid the same." Plaintiff understood these remarks as directed at her concerns about extended breaks and workplace practices.

85. Neal also repeatedly came to Plaintiff's work areas, including the Bag Line and Animal Feed area, where he drove his forklift in circles, performing what Plaintiff described as "donuts," while looking Plaintiff up and down. Plaintiff perceived this conduct as an attempt to intimidate her. On one occasion, Plaintiff told him, "Jerry, please leave me alone. You're not going to intimidate me." Neal laughed and replied, "Ha ha ha, have a good day, ma'am."

**May 24, 2026 — Sexual Harassment Report to Management**

86. On May 24, 2026, Plaintiff went to Supervisor Justin Anton's office and personally reported, in a face-to-face conversation, the sexual harassment and inappropriate sexual conduct occurring on the production floor, including Victoria Hotchkiss's repeated sexually inappropriate conversations and intrusive sexual questioning. Plaintiff alleges that management failed to adequately address the concerns she reported.

87. Plaintiff personally witnessed coworker Tia Cornell giving massages to coworker Patrick Mitchell in the workplace and engaging in repeated sexually explicit conversations and inappropriate sexual conduct on the production floor. On May 24, 2026, during a verbal complaint to Supervisor Justin Anton concerning sexual harassment and inappropriate sexual behavior in the workplace, Plaintiff specifically reported Cornell's conduct, including the massages she witnessed Cornell giving Mitchell and the

sexually explicit conversations occurring at work. Through this report, Plaintiff placed management on notice of the conduct she had personally witnessed.

**May 28, 2026 — Workplace Safety Complaint, Alleged Retaliation for Prior Safety Reporting, and Disparate Treatment Based on National Origin and Ethnicity**

88. On May 28, 2026, Plaintiff obtained permission from Production Manager Mike Schwartz and Supervisor Nicholson to work overtime providing break coverage on the Bag Line. At approximately 4:10 p.m., Plaintiff informed Brian Dillenback and Crystal Ringleka that she would assist with break coverage. During this period, Plaintiff raised concerns, both verbally and in writing, regarding coworkers taking extended breaks and the resulting excessive workload placed on Plaintiff and other employees. Plaintiff also verbally reported unsafe lifting conditions on the Bag Line, in addition to her previously reported concerns in Hot Mix. On the Bag Line, Plaintiff was sometimes left alone to manually dispose of as many as approximately 60 rejected bags, each weighing approximately 50 pounds, into shoulder-high animal-feed boxes. Plaintiff expressed concerns that the frequency and physical demands of these tasks, combined with inadequate assistance and uneven workload distribution, created ergonomic hazards and increased the risk of musculoskeletal injuries.

89. At approximately 5:00 p.m., Plaintiff overheard a conversation between Crystal Ringleka and Supervisor Christopher James Nicholson concerning break coverage. During the conversation, Ringleka objected to employees providing coverage during paid breaks, stating that employees were watching their breaks and engaging in what she described as "job retaliation." Plaintiff questioned whether employees were entitled to fifteen-minute breaks under the collective bargaining agreement, in the context of her ongoing concerns about adequate break coverage and excessive workloads. Nicholson then redirected the discussion toward Plaintiff's previously authorized overtime hours.

90. At approximately 5:36 p.m., Plaintiff observed Ringleka using a compressed-air hose to remove powder from the production line, creating a visible cloud of airborne powder. Plaintiff photographed the condition at approximately that time.

91. At approximately 6:00 p.m., Plaintiff approached Ringleka near the chain conveyor about break coverage and requested that she not use the compressed-air hose to disperse powder because of the airborne-powder safety concern.

92. Ringleka became upset and told Plaintiff to "get the fuck out of my face, Ana," directing additional profanity toward her. Plaintiff backed away while Ringleka continued yelling. Plaintiff alleges that surveillance cameras covered the area.

93. On May 28, 2026, Kensington approached Plaintiff in the cafeteria and asked what was happening in another work area. After Plaintiff responded, Kensington stated, "Aren't you supposed to be the crazy one?" and laughed. Plaintiff understood the comment in the context of his earlier stereotyping.

94. At approximately 6:20 p.m., Plaintiff exited through the Shipping Office entrance toward the parking lot to retrieve a notepad from her vehicle for work-related training purposes. Near the entrance, Plaintiff encountered Supervisor Christopher James Nicholson. While returning to the plant after retrieving her notepad, Plaintiff encountered Crystal Ringleka and Brian Dillenback smoking. Plaintiff smiled and laughed while jokingly remarking, "30 minutes, let's go."

95. Ringleka again yelled at Plaintiff, stating, "You're not my boss, you can't tell me what to do," and "That's why nobody likes you."

96. Plaintiff reported to Supervisor Christopher James Nicholson the disagreement with Crystal Ringleka concerning break coverage and the unsafe use of the compressed-air hose. Following the report, Plaintiff

returned to the Bag Line to resume her assigned duties. Approximately five to ten minutes later, Nicholson approached Plaintiff at the Bag Line and informed her that Ringleka had stated she did not want to work with Plaintiff. Nicholson then informed Plaintiff of his decision to send her home.

97. Nicholson stated that he did not want to deal with the "drama" and directed Plaintiff to leave, explaining that she had not originally been scheduled to work and was approaching sixty hours for the week. However, Plaintiff's overtime had already been authorized with management's knowledge of her accumulated hours, and Defendants had no established policy prohibiting employees from exceeding sixty hours per week. Nicholson was also aware of Plaintiff's previously reported workplace-safety concerns. Plaintiff alleges that Nicholson did not provide a meaningful opportunity for her to explain her account.

98. After Plaintiff reported Ringleka's verbal harassment and the unsafe use of compressed air, Nicholson informed Plaintiff that Ringleka refused to work with her. Rather than addressing Plaintiff's reported concerns, Nicholson directed Plaintiff to leave despite her previously authorized overtime. Nicholson then retrieved Lee, an employee from the Retail Line, to witness the conversation, stating that he wanted proof that the conversation had occurred. Nicholson proceeded to send Plaintiff home in Lee's presence. Plaintiff found the incident humiliating and degrading, particularly because she had raised workplace safety concerns, had been subjected to profanity and verbal hostility, and was ultimately the employee removed from the workplace while Ringleka was permitted to remain.

99. As a result, Plaintiff lost approximately five hours of previously authorized overtime. In contrast, Crystal Ringleka remained at work and continued her employment without any disciplinary consequences known to Plaintiff, despite Plaintiff having reported Ringleka's hostile conduct toward her to management. Plaintiff was not informed of any corrective or disciplinary action taken against Ringleka following the incident.

100. Ringleka is white and the daughter-in-law of Justin Anton, a member of management, while Plaintiff is Latina and of Salvadoran national origin. Plaintiff alleges that Nicholson sent her home after she had notified management on May 16 of her intention to report unsafe conditions to OSHA and submitted a written safety complaint on May 17. Plaintiff believes the loss of authorized overtime and different treatment of the two employees may have been motivated, at least in part, by retaliation for her safety reporting and/or discrimination based on her Salvadoran national origin and Latina ethnicity.

**May 30–June 4, 2026 — Safety Documentation, Suspension, and Disputed Discipline**

101. On May 30, 2026, Plaintiff completed a Near Miss/Safety Suggestion Form documenting concerns about airborne powder created by compressed-air cleaning. She photographed the completed form at approximately 6:03 p.m.

102. Plaintiff intended to submit the form to the Safety Manager but was suspended before doing so. The form was never submitted and is identified as contemporaneous documentation of Plaintiff's safety concern, not as notice actually received by management.

103. On June 1, 2026, Human Resources Manager Marcy Klavins informed Plaintiff that she was being suspended pending an investigation into allegations arising from May 28.

104. Klavins stated that Ringleka and Brian Dillenback had accused Plaintiff of threatening to punch Dillenback in the face. Plaintiff denied making any such threat and was asked to provide a written statement.

105. While suspended, Plaintiff emailed Klavins additional information and identified potential witnesses concerning the May 28 events.

106. On June 4, Klavins informed Plaintiff by telephone that the investigation had concluded Plaintiff had harassed coworkers and that her suspension would continue. Klavins described additional allegations that Plaintiff had blocked Ringleka's exit, prevented her from leaving the bag line, and followed Ringleka and Dillenback into the parking lot.

107. Plaintiff denied these allegations and explained that she had gone to her vehicle to retrieve a notepad used for training purposes, not to follow or confront either employee.

108. During the telephone conversation, Plaintiff attempted to explain the earlier hostility involving Ringleka, her workplace safety complaints, and her concerns about potential coordinated harassment by a group of coworkers, including what Plaintiff believed were inaccurate accusations being made against her.

109. According to Plaintiff, Klavins responded, "That's how factory jobs are, Ana," and told Plaintiff she needed to act according to the role for which she was hired.

110. During the telephone conversation, Klavins allegedly stated that Ringleka had reacted as she did because Plaintiff was "pushing her buttons." Klavins also instructed Plaintiff that, upon returning to the production floor, she needed to "stay quiet" and stop discussing workplace concerns and safety concerns with coworkers.

111. Plaintiff disputed the accusations arising from the May 28 incident and maintained that Defendants failed to adequately consider her account, potential witnesses, prior hostility, and the safety-related circumstances surrounding the confrontation. Plaintiff further alleges that Klavins's instruction discouraged discussions concerning shared working conditions and workplace safety, activities potentially protected under Section 7 of the National Labor Relations Act, 29 U.S.C. § 157.

**June 6–9, 2026 — Return to Work, Continued Harassment, and Medical Evaluation**

112. Plaintiff returned to work on June 6, 2026, following her suspension. She alleges that workplace hostility intensified and was accompanied by worsening psychological symptoms, including panic attacks, severe anxiety, and depression.

113. On June 6, 2026, at approximately 3:35 p.m., Plaintiff arrived at the workplace parking lot following her suspension. She observed Crystal Ringleka and Victoria Hotchkiss sitting in separate vehicles. Plaintiff remained in her vehicle for approximately ten minutes. When Plaintiff exited, both coworkers also exited their vehicles and walked toward the employee locker room behind her. Plaintiff found the timing concerning in light of the prior workplace hostility.

114. Later that day, while returning from the restroom through the locker room, Plaintiff encountered Hotchkiss getting ready near the corner where their lockers were located. Plaintiff said, "Excuse me," twice so she could pass and return to the production floor. Plaintiff then saw Ringleka standing near her own locker, with her hands on her hips, looking Plaintiff up and down. Plaintiff perceived Ringleka's conduct as intimidating in light of their prior confrontation.

115. During this encounter, coworker Mary Ellen entered the locker room, greeted Plaintiff, pulled her aside, and stated, "You shouldn't be left alone with these two." Plaintiff understood the statement as expressing concern about the situation.

116. On June 7, 2026, Plaintiff verbally reported the June 6 locker-room incident and her concerns about Ringleka's and Hotchkiss's conduct to union steward Joel Frohriep.

117. Plaintiff continued witnessing sexually inappropriate conduct involving Hotchkiss and other coworkers through June 7, 2026, notwithstanding her May 24 complaint.

118. On June 8, 2026, Plaintiff attended a meeting with Human Resources Manager Marcy Klavins, accompanied by union representative Jeremy Hayes, to receive and dispute a final written warning. Plaintiff attempted to explain her account of the May 28 events and the earlier hostility she experienced from Crystal Ringleka and other coworkers on the production floor.

119. During the meeting, Klavins stated, "You're just trying to fix everything, Ana, and you're not going to fix it," and "We already had this conversation, Ana. We're not going to go through it again." Plaintiff explicitly stated, "Marcy, I feel that I'm being discriminated against by the company." In response, Klavins turned to union representative Jeremy Hayes and stated, "Jeremy, this is already getting too emotional. Can we just stop this meeting right here?" Klavins subsequently issued Plaintiff a final written warning.

120. Plaintiff subsequently filed grievances through her union challenging the final written warning.

121. On June 9, 2026, Plaintiff was assigned to train on the scales in Dryer 2. Coworker Brian Dillenback repeatedly approached the scales area. In light of Plaintiff's recent disciplinary action arising from accusations she disputes and attributes to Dillenback, she began experiencing physical symptoms, including numbness in her face, tongue, and arms.

122. Plaintiff requested that Production Manager Schwartz and Supervisor Raymond McCain reassign her to another area because of her symptoms and her desire to avoid further accusations involving Dillenback. They agreed and reassigned Plaintiff to the Animal Feed area. At approximately 4:00 p.m., Plaintiff asked Supervisor Christopher James Nicholson to allow her to remain in Animal Feed, and he agreed.

123. While Plaintiff worked in Animal Feed, coworker Jerry Neal repeatedly entered or returned to her work area. Because of Neal's prior comments and conduct that Plaintiff perceived as hostile and intimidating, Plaintiff experienced worsening symptoms and distress throughout the day.

124. Plaintiff sought assistance from Union Steward Joel Frohriep and asked him to speak with Nicholson about keeping certain coworkers away from her work area, both because Plaintiff believed their presence aggravated her symptoms and because she wanted to avoid further accusations. Plaintiff identified Crystal Ringleka, Victoria Hotchkiss, Brian Dillenback, Jerry Neal, and Anthony Williams.

125. Joel Frohriep subsequently told Plaintiff that, rather than addressing the requested separation, Nicholson had approached Neal and stated words to the effect of, "Ana says that you keep coming back to her work area." Plaintiff then followed up directly with Nicholson about her request and Joel Frohriep's conversation with him.

126. According to Plaintiff, Nicholson dismissed her concerns and stated, in substance, "These guys, they need this job. They're not going to do something stupid. They live in the halfway house. They just got out of jail. They're not going to get in trouble, Ana." Nicholson also told Plaintiff, "I think you're seeing things," and suggested she should be checked by a doctor because she was seeing things that were not there. Nicholson stated that Neal and the other employees could enter the Animal Feed area whenever they wanted.

127. Nicholson further stated to Plaintiff, "You're the one who's always coming to me to tell on your coworkers when they're taking extended breaks," and accused Plaintiff of "creating unnecessary drama and unnecessary gossip about Crystal." Plaintiff had previously reported concerns regarding extended breaks, inadequate coverage, excessive workloads, and workplace safety. Plaintiff believed Nicholson was dismissing her workplace complaints as gossip rather than addressing the concerns she had raised.

128. Following these accusations, Nicholson told Plaintiff she could remain in the Animal Feed area and work with Nate, asking, "You don't have a problem working with Nate, right? Do you?" Nicholson then

asked Plaintiff where Nate was. Although Plaintiff was aware that Nate had been outside in his vehicle for an extended period, she lowered her head and responded, "I don't know. I'm not supposed to be telling on my coworkers, right?" Plaintiff refrained from reporting Nate's whereabouts after Nicholson had criticized her for raising concerns about other employees' extended breaks.

129. Following the June 9 interaction involving Jerry Neal and Nicholson, Plaintiff left the facility to seek medical attention because of severe distress and physical symptoms. During the medical evaluation, staff documented a shoulder bruise Plaintiff believed resulted from repetitive lifting performed during her Animal Feed assignment.

**June 2026 — Written HR Complaints and Management's Failure to Address Concerns**

130. On June 12, 2026, Plaintiff submitted a written complaint to Human Resources Manager Marcy Klavins concerning discrimination based on her Latina ethnicity and Salvadoran national origin. Plaintiff alleges that she did not receive a response addressing those concerns.

131. On June 12, 2026, Plaintiff submitted written complaints to the Plant Manager alleging discrimination based on her ethnicity and sex. Plaintiff specifically raised concerns regarding Human Resources Manager Marcy Klavins's and Supervisor Christopher James Nicholson's handling of her prior complaints of harassment and discrimination. Plaintiff received no response to her written complaints, and the concerns she raised were not addressed with her.

**June–August 2026 — Reports to Government Agencies, Disability Discrimination, Alleged Failure to Provide Reasonable Accommodations, Medical Leave, and Resulting Harm**

132. Following Plaintiff's reports to Human Resources concerning discrimination, hostility, coordinated harassment, targeting, and retaliation, Plaintiff and her treating physician requested a reasonable accommodation on June 12, 2026, seeking reassignment to a different work area and shift because interactions with certain employees were aggravating her medical symptoms. Defendants denied the requested accommodation, after which Human Resources advised Plaintiff to pursue short-term disability leave.

133. Before beginning short-term disability leave, Plaintiff requested permission from Human Resources to return to work for at least the weekend. Plaintiff explained that she was a single mother responsible for supporting herself and her daughter and was concerned about the financial consequences of taking leave. Human Resources responded that it would be difficult to separate Plaintiff from the employees whose conduct was aggravating her medical symptoms. Plaintiff subsequently requested short-term disability benefits.

134. On June 14, 2026, Plaintiff filed formal complaints with OSHA concerning unsafe workplace conditions. Plaintiff alleges that OSHA notified Defendants of the complaints. The exact notification date remains subject to verification.

135. On the night of June 14, 2026, Plaintiff experienced severe psychological distress, including suicidal ideation and a suicide attempt. Plaintiff also experienced intense anxiety, panic symptoms, dizziness, dissociation, and disorientation, including difficulty orienting herself within her own home.

136. On June 15, 2026, amid continuing and severe suicidal ideation, Plaintiff voluntarily sought emergency psychiatric care. Following an evaluation, medical professionals determined that inpatient psychiatric hospitalization was necessary. Plaintiff was hospitalized for four days.

137. After Plaintiff attempted to resolve her discrimination concerns with the Plant Manager through emails that went unanswered, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on June 24, 2026, concerning discrimination and harassment based on

her Salvadoran national origin, Latina ethnicity, religious beliefs, and sex, including sexual harassment, under Title VII of the Civil Rights Act of 1964.

138. Plaintiff subsequently required approximately two and a half months of short-term medical leave. During this period, Plaintiff underwent medical treatment, including hospitalization or partial hospitalization, and received diagnoses that included post-traumatic stress disorder and major depressive disorder (MDD).

139. Plaintiff alleges that her treating medical providers attributed significant aspects of her psychological condition to the harassment and discrimination she experienced at TreeHouse Foods, as reflected in her medical records.

140. Plaintiff alleges that her health conditions and medical leave caused substantial emotional suffering, disruption of daily functioning, medical expenses, and financial losses.

**August 24, 2026 — Return From Leave and Reported Workplace Hostility**

141. Plaintiff returned to work on August 24, 2026. She alleges that workplace hostility continued despite her earlier complaints to management and regulatory agencies.

142. Upon returning from medical leave on August 24, 2026, Plaintiff discovered that her workplace locker had been emptied and her personal belongings removed, including rainbow/Pride stickers reflecting her LGBTQ+ identity. Plaintiff later observed decorations she recognized as her missing property displayed on coworker Crystal Ringleka's locker and documented the incident with photographs.

143. Plaintiff formally reported the incident to Human Resources. Although Human Resources represented that it had completed an investigation and taken appropriate remedial action, Plaintiff's belongings were not returned, including her safety shoes, safety locks, keys, and notebooks containing work-related training notes. Plaintiff was not informed who removed her property.

144. The removal of Plaintiff's Pride decorations and the discovery of her belongings on Ringleka's locker reinforced Plaintiff's previously reported concerns regarding hostility, harassment, and discrimination based on her sexual orientation, including prior conflicts involving Ringleka.

145. On or around her return to work, Plaintiff learned from coworkers that Patrick Mitchell had reportedly expressed a desire to have Plaintiff removed from the workplace because she had contacted OSHA. Plaintiff did not personally hear Mitchell make these statements. However, the statements reported to her reinforced her longstanding concerns regarding hostility, harassment, and discrimination she had previously experienced from Mitchell, including his efforts to have her removed from Hot Mix. Plaintiff had previously reported these concerns to management.

146. Plaintiff also experienced workplace gossip, rumors, and isolation. She alleges that certain coworkers encouraged others not to communicate with her and that some employees refused to speak with her. Plaintiff believed at least some of this hostility was connected to her OSHA complaints.

147. After Plaintiff returned, coworker Josh Hoyle informed her that Nicholson had questioned why she was back at work, making a statement to the effect of, "How is she still back?" Hoyle also reported Nicholson saying, "Your girlfriend is back," referring to Plaintiff. Plaintiff did not personally hear these statements. Although Plaintiff did not hear these remarks directly, the statements reported to her reinforced her longstanding concerns about workplace hostility and discrimination, which she had previously reported to management.

**August 31–September 1, 2026 — Heat Illness, Authorized Temperature Measurement, and Safety Reporting**

148. On August 31, 2026, while cleaning the second floor of Dryer 2 with boiling water and an air hose, Plaintiff experienced symptoms consistent with heat illness and went downstairs to cool off.

149. On September 1, 2026, Plaintiff asked Supervisor Ereck Thames for permission to take a thermometer from the first floor to the hotter second floor of Dryer 2. Thames authorized the request. Plaintiff measured a temperature of 100°F, reported the excessive heat, and requested protective measures to reduce the risk of heat-related illness, including heat stroke. A rest schedule was subsequently implemented.

**September 5–6, 2026 — Heightened Scrutiny, Immigration Remarks, and OSHA Comments**

150. On September 5, while Plaintiff was operating Hot Mix, mechanical problems delayed completion of her assigned blends. Nicholson was aware of the mechanical issues.

151. At approximately 7:00 p.m., when Dryer 2 announced over the intercom that it was pulling mix, Nicholson responded, "About time." Plaintiff personally heard the remark, and coworker LaShaun Sherrod subsequently identified Nicholson as the speaker. Immediately afterward, another unidentified individual used the intercom to make a mocking vocal sound in apparent imitation of Nicholson's remark. Plaintiff perceived the public comment as unwarranted criticism.

152. On September 5, 2026, Nicholson repeatedly called Plaintiff over the intercom at least five times in succession, using a loud and aggressive tone. While Plaintiff was on her way to the supervisor's office in response, she encountered Nicholson near the entrance to Retail One. Nicholson appeared visibly irritated and questioned Plaintiff about her arrival time, whether she had been working since noon, and the number of blends she had sent to the dryer. Nicholson stated that he was investigating production issues in the dryer and attempting to determine whether Plaintiff had caused them while working in Hot Mix.

153. On September 6, 2026, at approximately 9:00 p.m., coworker Brian Chase, a white male, made derogatory remarks about undocumented immigrants during a conversation with Plaintiff in the employee break room. Chase stated that immigrants should enter the country "the right way" and claimed that undocumented immigrants were taking American workers' jobs, stating, "They are taking our jobs." Plaintiff challenged his statements and considered the remarks part of a broader pattern of anti-immigrant hostility in the workplace.

154. During the same conversation, coworker Brian Chase made comments about OSHA involvement and the possibility of the facility being shut down and suggested that Plaintiff find another job. Plaintiff perceived these statements as hostile toward her safety reporting. Plaintiff was subsequently informed by Supervisor Eric James that Chase had come to his office and stated, "I already told Ana that if she doesn't like this job, she needs to go find another one." Plaintiff did not personally witness Chase make this statement to James.

**September 2026 — Continued Religious and Height-Based Harassment and Failure to Take Prompt and Appropriate Corrective Action After Notice**

155. During the month of September 2026, coworker Ariana Rivas played Christian music on her phone in the employee locker room on approximately five consecutive workdays when Plaintiff was present. On multiple occasions, Rivas entered the locker room without playing music, looked around to determine whether Plaintiff was present, and immediately began playing Christian music upon seeing her. Plaintiff did not object to religious music itself, as other employees routinely played Christian music or sermons in

common areas. Rather, Plaintiff perceived Rivas's repeated and selective conduct, considered alongside earlier unwanted religious pressure, as intentionally directed toward her because of her atheism.

156. On September 7, 2026, Plaintiff was directed to train with coworker Jerry Neal, despite having previously reported his longstanding harassment to management. Plaintiff informed Supervisor Ereck Thames and Production Manager Mike Schwartz that she did not feel safe training with Neal because her documented harassment complaints had not been adequately addressed. Plaintiff subsequently left work early rather than continue working under the reported conditions.

**Escalation of Workplace Harassment and Discrimination Complaints to Human Resources Leadership**

157. On September 8, 2026, while training as a material handler in Dryer 2 with Rolando Reid, Plaintiff was required to retrieve sample bags from approximately six-foot-high totes. Scales operator Anthony Williams repeatedly placed the sample bags at the bottom center of the totes for approximately two hours, rather than at the accessible corner customarily used for retrieval by material handlers. As a result, Plaintiff had to jump to reach the bags or obtain Reid's assistance. Reid independently observed the conduct and spoke to Williams about stopping it. Plaintiff perceived Williams's repeated actions as targeting her height and interfering with her training duties.

158. Plaintiff reported Supervisor Christopher James Nicholson's continued hostile treatment to the Human Resources Director. Plaintiff also reported Nicholson's social media posts, including posts Plaintiff perceived as mocking or hostile and posts using derogatory language about women. Plaintiff's complaints to Human Resources also identified Ariana Rivas, Pat Mitchell, and Christopher James Nicholson as individuals whose alleged harassment and hostile conduct toward Plaintiff had continued over an extended period.

159. Plaintiff also reported to the Human Resources Director her concerns about workplace mobbing, coordinated harassment and targeting, attempts to isolate her, and continuing hostility from coworkers and a supervisor.

**September 13, 2026 — Reported Proposed Discipline for Authorized Heat Measurement**

160. On September 13, 2026, Supervisor Ereck Thames told Plaintiff that Production Manager Mike Schwartz had wanted Thames to write her up for taking the thermometer upstairs, although Thames had expressly authorized the measurement. Plaintiff did not personally hear Schwartz make that request; Thames was the source of this information.

161. Plaintiff believed the reported proposal to discipline her for documenting excessive heat, together with scrutiny and hostility following her OSHA complaints, reflected potential retaliation for reporting workplace safety concerns. Plaintiff alleges that management was aware of her external safety reporting.

**September 13, 2026 — Social Media Post Following HR Complaints**

162. On September 13, 2026, Plaintiff became aware of a Facebook post appearing under Supervisor Christopher James Nicholson's name that stated, in part, "When you read this you will know just who I'm talking about," referred to the intended person as an "Oompa Loompa," and stated that "Everyone is pointing and laughing at you." Plaintiff perceived the post as a derogatory reference to her short stature and as directed toward her, particularly because she had recently reported Nicholson's social media conduct to the Human Resources Director and discussed his posts with coworkers. The post did not identify Plaintiff by name, and Plaintiff cannot independently confirm its intended target. Plaintiff perceived the timing and language as further hostility and possible retaliation following her complaints.

163. Plaintiff also became aware of a TikTok video posted by an account appearing to belong to Supervisor Christopher James Nicholson, captioned "Expectations of returning to work after 6 days off." In the comments, the account identified as the creator stated, "I Have one employee for sure thinking this for sure." Plaintiff understood the video and comment, viewed in the context of her prior complaints and Nicholson's other social media posts, as potentially directed toward her. The post did not identify Plaintiff by name.

164. Plaintiff reported Nicholson's social media post to the Human Resources Director.

**September 2026 — Scheduling Concerns and Denial of Overtime Opportunities**

165. On September 17, 2026, coworker Tia Corner, who had less seniority than Plaintiff, received a preferential Monday-through-Friday, first-shift schedule, reportedly at Pat Mitchell's request. Plaintiff had greater seniority and believed this assignment was inconsistent with the seniority provisions governing scheduling opportunities under company policy and the collective bargaining agreement.

166. During the same period, employees with less seniority than Plaintiff received overtime opportunities that Plaintiff was not offered, despite Plaintiff signing up for overtime in accordance with established company procedures. Plaintiff alleges that these disparities deprived her of scheduling opportunities and additional earnings.

**September 20–22, 2026 — Workplace Confrontation and Management Response**

167. On September 20, 21, and 22, 2026, coworker Ariana Rivas repeatedly came to Plaintiff's work area before or after shift handoffs, scrutinized Plaintiff's work for perceived errors, and reported those errors to supervisors. On one occasion, Rivas wrote notes identifying alleged mistakes and had operators deliver them to Plaintiff rather than speaking to her directly. On another occasion, Rivas came to the workplace during Plaintiff's shift and repeatedly called over the intercom in an aggressive, raised voice, "Ana, please come up, take out the trash. Ana, come take out the trash."

168. On September 20, 2026, Plaintiff experienced worsening physical symptoms, including nausea, dizziness, lightheadedness, and dissociation, and left work early. That same day, Plaintiff again emailed Human Resources to report concerns regarding Rivas's conduct. Plaintiff associated the worsening symptoms with the continuing workplace hostility.

169. On September 21, 2026, Plaintiff experienced a workplace confrontation involving coworker Ariana Rivas in the presence of Supervisor Christopher James Nicholson. Rivas initiated the confrontation by approaching Plaintiff about a hole in a bag, a minor issue that commonly occurred during hot-mix production. Plaintiff did not seek out or initiate the confrontation. During the confrontation, Rivas directly referenced Plaintiff's Salvadoran national origin, stating, "You're Salvadorian. I'm Dominican. I'm not scared of you." Plaintiff perceived the statement as hostile and intimidating because Rivas explicitly singled out her national origin during the confrontation.

170. Nicholson witnessed the confrontation but did not address Plaintiff's concerns regarding Rivas's remarks. Instead, Nicholson stated, "Ladies, ladies, ladies," leaned toward Rivas, placed his hand on her shoulder, and told her, "I got you."

171. Plaintiff alleges that the September 21 confrontation was recorded on video. Plaintiff perceived Nicholson's response as supportive of Rivas while her own concerns regarding national-origin discrimination remained unaddressed.

172. Plaintiff alleges that Nicholson did not address Rivas's express reference to Plaintiff's Salvadoran origin and appeared supportive of Rivas when he placed his hand on her shoulder and stated, "I got you."

Plaintiff believes the response was inconsistent with his supervisory responsibility to address discrimination.

173. In approximately September 2026, after management failed to adequately address Plaintiff's repeated complaints concerning Ariana Rivas's hostile and harassing conduct, Plaintiff feared for her physical safety. Plaintiff went to the police department to report the conduct, seek documentation of the incident, and inquire about obtaining a personal protection order (PPO) against Rivas.

174. On Monday, September 21, 2026, Plaintiff was called to the Human Resources Director's office and informed that she would be temporarily assigned to a different work schedule while Human Resources investigated her complaints of ongoing harassment and hostile treatment. Plaintiff was assigned the alternative schedule for September 22 and 23, 2026.

**September 28, 2026 — Language-Based Remarks and Training Exclusion**

175. On September 28, 2026, coworker Chris Davis, a white male, stated "Ándale, puto" in Spanish to another coworker in Plaintiff's presence. Plaintiff perceived the remark and its delivery as mocking Latino speech and contributing to the hostile workplace environment she experienced based on her Latina ethnicity and Salvadoran national origin.

176. On September 28, Plaintiff alleges that she was excluded from a workplace training opportunity while other employees received training or opportunities that were not made available to her.

177. Plaintiff also experienced refusals of workplace assistance and failures of communication during shift handoffs, including an incident involving Tia Cornell.

178. Plaintiff became aware of allegations that a trainer had refused to train another employee of Vietnamese origin. Plaintiff considers the reported incident relevant to her concerns about broader unequal treatment but does not claim personal knowledge of every circumstance.

179. Between October 18 and October 24, 2026, coworker Tia Cornell repeatedly failed to provide Plaintiff with shift handoffs, depriving Plaintiff of essential work-related information and obstructing effective shift transitions. This conduct continued after Plaintiff reported Cornell's refusal to cooperate and exclusion from workplace communications to Production Manager Mike on September 28, 2026, placing management on notice of the ongoing problem.

**Continuing Harm and Relationship Among the Events**

180. Plaintiff alleges that the events described above involved overlapping patterns of sexual harassment, religious harassment, national-origin discrimination, sex-based unequal treatment, workplace safety complaints, management notice, disputed discipline, and adverse employment treatment.

181. Despite repeated verbal and written complaints to supervisors, Human Resources, and upper management, Defendants failed to take effective corrective action to stop the reported harassment, discriminatory treatment, and workplace hostility. Plaintiff continued experiencing hostile conduct after management received notice.

182. Following Plaintiff's complaints of harassment, discrimination, and workplace safety violations, she experienced heightened scrutiny, disputed discipline, workplace isolation, reduced overtime opportunities, unfavorable scheduling treatment, exclusion from training, and repeated interference with essential workplace communication.

183. Plaintiff contends that Defendants subjected her to retaliatory treatment following two categories of protected activity: her opposition to workplace harassment and discrimination, and her reporting of

suspected workplace safety violations to OSHA. The alleged adverse treatment continued after management became aware of her complaints.

184. Plaintiff suffered severe psychological, physical, and financial harm following the alleged harassment, discrimination, and retaliation. Her resulting medical leave caused a substantial loss of income, leaving her unable to pay rent in June, July, August, and October 2026. Plaintiff's deteriorating mental health and the debilitating effects of prescribed psychiatric medications also substantially impaired her ability to maintain her residence. These circumstances contributed to her eviction and loss of housing. As a consequence, Plaintiff was forced to surrender one of her dogs to an animal shelter because she could no longer accommodate all her pets. Her continuing financial hardship has also prevented her from bringing her minor daughter back from El Salvador, prolonging their separation. Plaintiff seeks compensation for these injuries and their resulting emotional and financial consequences to the extent permitted by law.

185. Plaintiff seeks all compensatory, equitable, and other relief authorized by the applicable laws, including recovery for proven emotional distress, medical expenses, lost earnings, and other legally recoverable damages, without duplicative recovery for the same injury.

## III. CLAIMS FOR RELIEF

### COUNT I — TITLE VII: SEX DISCRIMINATION AND SEXUAL HARASSMENT

186. Plaintiff incorporates paragraphs 1–185. She experienced unwelcome sexual touching, sexually intrusive questions, sexual comments, and sex-based hostility, including harassment she witnessed and reported on the production floor.

187. Plaintiff reported the conduct to management, including verbally on May 24, 2026. The conduct affected her working conditions, and Plaintiff alleges Defendants knew or should have known of actionable coworker harassment but failed to take prompt and appropriate corrective action. Plaintiff also alleges unequal employment treatment because of sex.

### COUNT II — TITLE VII: NATIONAL-ORIGIN DISCRIMINATION AND HARASSMENT

188. Plaintiff incorporates paragraphs 1–185. She alleges hostility and derogatory remarks tied to her Salvadoran national origin, Latino ethnicity, Spanish language, and perceived immigrant background, including Ariana Rivas's September 21, 2026 remarks and other language-based incidents.

189. Plaintiff alleges that this conduct, considered together with unequal access to training, opportunities, and management intervention, affected the terms and conditions of her employment; that management received notice; and that Defendants failed to take appropriate corrective action.

### COUNT III — TITLE VII: RELIGIOUS DISCRIMINATION AND HARASSMENT

190. Plaintiff incorporates paragraphs 1–185. Plaintiff is an atheist. She alleges repeated unwanted religious persuasion, intrusive religious questioning, and unwanted touching after she made clear that the conduct was unwelcome.

191. Plaintiff further alleges that Ariana Rivas repeatedly and selectively played Christian music when Plaintiff entered the locker room in September 2026. Plaintiff does not contend that playing religious music, without more, is unlawful; she alleges the selective conduct formed part of a broader pattern of religion-based targeting of which management had notice and failed to adequately correct.

**COUNT IV — TITLE VII: RETALIATION**

192. Plaintiff incorporates paragraphs 1–185. Plaintiff opposed sexual harassment, religious and national-origin discrimination, and other conduct she reasonably believed violated Title VII through verbal and written complaints to supervisors, Human Resources, and management, and through an EEOC charge.

193. After these complaints, Plaintiff alleges disputed discipline and loss of work hours, heightened scrutiny, exclusion from training, reduced overtime opportunities, unfavorable scheduling treatment, and interference with workplace communication. Plaintiff alleges that Defendants imposed or permitted materially adverse treatment because of her protected complaints.

**COUNT V — AMERICANS WITH DISABILITIES ACT**

194. Plaintiff incorporates paragraphs 1–185. Plaintiff alleges medically documented psychological impairments, notice to Defendants of her limitations, and a physician-supported June 12, 2026 request for reassignment of her work area or shift that was denied.

195. Plaintiff alleges that she could perform the essential functions of her position with a reasonable accommodation, that Defendants failed to engage adequately with her request or provide an available reasonable accommodation, and that she suffered adverse treatment connected to her disability or protected ADA activity, to the extent supported by the evidence and applicable administrative prerequisites.

**COUNT VI — MICHIGAN ELLIOTT-LARSEN CIVIL RIGHTS ACT: DISCRIMINATION, HARASSMENT, AND RETALIATION**

196. Plaintiff incorporates paragraphs 1–185. Under MCL 37.2202 and 37.2701, Plaintiff alleges discrimination or actionable harassment based on sex, national origin, religion, and sexual orientation, and retaliation for opposing practices prohibited by the Act.

197. Plaintiff alleges that management received repeated notice of the reported harassment but failed to take prompt and appropriate corrective action, and that she experienced disputed discipline, unequal work opportunities, heightened scrutiny, and other adverse treatment following protected complaints. The distinct height-based claim is pleaded in Count VII.

**COUNT VII — MICHIGAN ELLIOTT-LARSEN CIVIL RIGHTS ACT: HEIGHT DISCRIMINATION AND HARASSMENT**

198. Plaintiff incorporates paragraphs 1–185. Michigan law expressly prohibits discrimination in employment because of height, including with respect to training and other terms or conditions of employment. MCL 37.2202; MCL 37.2205.

199. Plaintiff alleges a continuing pattern of height-based harassment and interference with her working conditions. Beginning in approximately September or October 2025, coworker Patrick Mitchell repeatedly requested that management remove Plaintiff from Hot Mix because of her short stature. On September 8, 2026, Anthony Williams repeatedly placed sample bags beyond Plaintiff's accessible reach during Dryer 2 training, contrary to customary practice, requiring Plaintiff to jump or seek assistance; Rolando Reid observed the conduct and intervened. On September 13, 2026, Plaintiff became aware of a Facebook post attributed to Supervisor Christopher James Nicholson referring to an unidentified person as an "Oompa Loompa." Although the post did not identify Plaintiff, she perceived its language and timing as height-related ridicule directed at her. Plaintiff contends that these incidents, considered together, reflect unequal treatment because of her height.

### COUNT VIII — MICHIGAN WHISTLEBLOWERS' PROTECTION ACT (MCL 15.361 ET SEQ.)

200. Plaintiff incorporates paragraphs 1–185. On May 16, 2026, Plaintiff informed management of her intention to report suspected unsafe lifting conditions to OSHA; in June 2026 she reported suspected workplace safety violations to OSHA, a public body. Plaintiff alleges Defendants knew of her protected reports or intended reports.

201. After the safety reports, Plaintiff alleges heightened scrutiny, threats or proposals of discipline concerning safety documentation, lost overtime or opportunities, and other adverse employment treatment. Plaintiff alleges a causal connection between the protected reporting and these actions, including statements attributed to coworkers concerning her OSHA complaints.

202. Plaintiff brings this claim under Michigan's Whistleblowers' Protection Act, MCL 15.362, based on Defendants' alleged retaliation following her reports of suspected workplace safety violations to a public body. Plaintiff seeks all relief available under MCL 15.363 and MCL 15.364 for timely and actionable violations.

## IV. REQUEST FOR RELIEF

Plaintiff respectfully requests that the Court enter judgment in her favor against each Defendant found liable and award the following relief, to the extent authorized by applicable law:

A. Compensatory damages for emotional distress, mental anguish, medical and psychological treatment expenses, and other injuries resulting from Defendants' unlawful conduct;

B. Back pay, lost wages, denied overtime, lost employment benefits, and other proven economic losses;

C. Front pay or other appropriate equitable relief for future economic losses, where warranted;

D. Punitive damages against any Defendant and under any claim for which such damages are legally available;

E. All damages and remedies available under Michigan's Elliott-Larsen Civil Rights Act and Whistleblowers' Protection Act, including MCL 15.364;

F. Prejudgment and postjudgment interest, taxable costs, and any attorney fees or other expenses recoverable under applicable law; and

G. Such other and further relief as the Court deems just and proper.

Plaintiff does not seek duplicative recovery for the same injury.

## V. JURY DEMAND

Plaintiff demands trial by jury on all issues triable by jury as of right.

Respectfully submitted,

Signature: Ana B

Ana Baires, Plaintiff, pro se

Date: 10/26/26

Mailing address: 334 Dickinson St SW, Grand Rapids, 49507

Telephone: 616-322-0189

Email: ana_sbaires1993@outlook.com